912 P.2d 1255 (1996)
In the Matter of J.L.F. and K.W.F., Minors Under the Age of Eighteen (18) Years.
K.F., Mother of the Above Named Minors, Appellant and Cross-Appellee,
v.
STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, Appellee and Cross-Appellant.
Nos. S-6230, S-6240.
Supreme Court of Alaska.
March 15, 1996.
G. Blair McCune, Assistant Public Defender, John B. Salemi, Public Defender, Anchorage, for Appellant and Cross-Appellee.
Dianne Olsen, Assistant Attorney General, Anchorage, Bruce M. Botelho, Attorney General, Juneau, for Appellee and Cross-Appellant.
Barbara L. Malchick, Deputy Public Advocate, Brant McGee, Public Advocate, Anchorage, for Cross-Appellant Guardian Ad Litem.
Before RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

*1257 OPINION

MATTHEWS, Justice.

I. Introduction

In our prior opinion, In re J.L.F. and K.W.F., 828 P.2d 166 (Alaska 1992), we summarized the factual and procedural context this case presented:
K.F. is a twenty-six year old mother of two young boys, J.L.F., born September 1987, and K.W.F., born November 1988. Applying a clear and convincing evidence standard, the superior court both adjudicated the children as children in need of aid (CINA) and found that K.F. was unable to care for the children. Consequently, upon petition by the state, the superior court terminated her parental rights. K.F. appeals both the CINA finding and the termination of her parental rights.
Id. at 167 (footnote omitted). K.F. contended that the superior court did not have jurisdiction to make a CINA adjudication under AS 47.10.010(a)(2)(A) because the State did not prove that there were no relatives available to provide care for the children.[1]Id. at 169. We accepted K.F.'s argument that a CINA determination under subparagraph (A) required a finding that there existed no "relative *1258 caring or willing to provide care." Id. at 170. The State also argued that the CINA determination could be upheld under subsection (C) which requires "an imminent and substantial risk that the child will suffer [substantial physical] harm as a result of the actions done by or conditions created by the child's parent...." We noted that certain findings made by the trial court seemed to relate to subsection (C) but that the court had declined to base its ultimate CINA finding on (C). Id. at 170. We ordered a remand, directing the trial court to reconsider its determination as to whether the children were in need of aid under subsection (C). If the superior court determined on remand that the children were not in need of aid under subsection (C) it was directed to determine whether there were relatives caring or willing to provide care for the children. Id. at 170 n. 11.
On remand, the superior court concluded that the record did not support "a finding that these children would be exposed to `imminent' risk of substantial harm" pursuant to subsection (C). In reaching this conclusion the court noted that the State's presentation at the original trial was complete. Therefore, a further hearing on this issue was not warranted. The court concluded that "[t]he facts of this case do not support termination under [subsection (C)]." The court then sought to determine whether it had jurisdiction under subsection (A) by ordering a supplemental hearing on the issue of whether there was "a relative, custodian or guardian willing to provide proper care for either of these children."[2]
Prior to the supplemental hearing, the State filed an amended petition for termination of parental rights. In addition to alleging jurisdiction under subsection (A), the petition alleged that K.F.'s parental rights should be terminated under AS 25.23.180(c)(2) because she unreasonably withheld her consent to adoption.[3]
At the supplemental hearing on remand, K.F.'s aunt, L.H., who resides in the state of Washington, testified that she and her husband *1259 were willing to care for the children. At the conclusion of the hearing the trial court found that L.H. and T.H. were not willing to care for the children and concluded that the children were children in need of aid under subsection (A). The court entered an order terminating K.F.'s parental rights and responsibilities. The following findings and conclusions of the trial court pertain to the question of the existence of relatives caring or willing to provide care for the children:
8. There is clear and convincing evidence that there are no relatives caring or willing to care for the above-named minors. This finding is based in part upon the following evidence.
a. The parties stipulated that the only relatives willing to provide care for the minors are [T.H. and L.H.], who reside in Pasco, Washington.
b. Although a positive homestudy through the Interstate Compact for the Placement of Children was received pertaining to the home of [T.H. and L.H.], [L.H.] intentionally and repeatedly misled the department about the location of the mother of the children when the department was attempting to serve the mother with the original petition for termination of parental rights. In fact, the mother had been residing with [T.H. and L.H.].
c. The department denied placement with [T.H. and L.H.] (1) because it had concerns that [T.H. and L.H.] were motivated to have the children placed with them so the mother could provide care for the children and the department had serious and justified concerns about the mother's ability to safely care for the children, and (2) because [T.H. and L.H.] exhibited a lack of ability to cooperate with agencies involved in providing services for these children. The department's decision not to place the children with [T.H. and L.H.] was justified. The actions of [T.H. and L.H.] reflect their inability to care for these children.
d. The testimony of [L.H.] also reflected an unrealistic plan that the children be placed with her so they could ultimately be placed with their biological mother.
e. [T.H. and L.H.] have never contacted the minors, personally, telephonically, or in written form.
9. No relatives exist who are able to provide care for these children, as "caring" is defined in AS 47.10.990(1).
10. AS 47.10.010(a)(2)(A) which provides this court with jurisdiction if there is "no parent, relative, .. . caring or willing to provide care" must be read to include an ability to care. Mere wishful thinking about one's willingness to provide care is not sufficient.
The court also concluded that K.F. had unreasonably refused to consent to adoption. The court made the following findings and conclusions on this point:
11. There is clear and convincing evidence that [K.F.] has unreasonably withheld her consent to the adoption of the above-named minors by [A.R.] and [S.M.], pursuant to AS 25.23.180(c)(2). This finding is based upon the following facts:
a. [K.F.] has refused to consent to an adoption of the above-named minors by [A.R.] and [S.M.].
b. The minors have resided in the home of [A.R.] and [S.M.] for four years and eight months.
c. [K.W.F.] is bonded to [A.R.] and [S.M.], and any disruption of that bond would cause extensive damage to him. [J.L.F.] is attached to [A.R.] and [S.M.], although it is likely he is not capable of being bonded to anyone. A disruption of this attachment would likely cause serious harm to [J.L.F.].
d. Both children have extreme special needs, as reflected in Department's Exhibits 1 through 10. They are doing as well as they are primarily due to the special attention and skills of [A.R.] and [S.M.]. Any movement from their present placement would likely cause [J.L.F.] to become mentally ill and perhaps require institutionalization *1260 in a mental hospital and would likely cause [K.W.F.] to behave aggressively and perhaps require institutionalization in a juvenile detention facility.
e. No family members who have requested placement of the children with them have ever communicated with these children.
f. [K.F.] led the department to believe that she did not want to disrupt the children's present placement by negotiating a conditional relinquishment to the present foster parents, which relinquishment was never signed. It was not until September 1993 that [K.F.] stated her unequivocal desire to contest this termination proceeding.
K.F. appeals from the order of termination. She presents three arguments: First, the trial court made an error of law in considering T.H. and L.H.'s ability to provide care for the children as a component of the "willing to provide care" statutory standard. Second, even if ability to provide care is a component of willingness, the trial court's conclusion that T.H. and L.H. lacked willingness to provide care for the children is clearly erroneous. Third, the trial court erred in concluding that the unreasonable withholding of consent to adoption standard of AS 25.23.180(c)(2) for termination of parental rights applied to this proceeding.
The guardian ad litem (GAL) and the State cross-appeal, contending that the trial court erred in failing to find the children to be children in need of aid under subsections (C) and (F) of AS 47.10.010(a)(2). We hold that each of the three arguments presented on appeal by K.F. are correct and that the arguments of the GAL and the State on cross-appeal are not correct. We proceed to a discussion of these points.

II. Subsection (A) Does Not Call for an Assessment of a Caregiver's Ability to Care.

In In re S.A. and D.A., 912 P.2d 1235 (1996), we ruled that
a child may not be adjudicated CINA under [subsection (A)] on the grounds that the child's parent or caregiver is unable to care for the child if the parent or caregiver is willing to care for the child. A parent's or caregiver's ability to care may be considered under the specific, explicit standards of AS 47.10.010(a)(2)(B)-(F).
912 P.2d at 1242. This holding was based on the plain language of subsection (A). "Subsection (A) allows a CINA adjudication if there is no `parent ... caring or willing to provide care.' Subsection (A) does not state `having no parent ... caring and willing to provide care.'" 912 P.2d at 1239. Relevant to the trial court's finding that the definition of care or caring impliedly makes ability to care relevant under subsection (A)[4] we stated:
The State has argued that subsection (A) covers ability to care because AS 47.10.990(1) states, "`care' or `caring' under AS 47.10.010(a)(2)(A) ... means to provide for the physical, emotional, mental, and social needs of the child." See F.T. [v. State, 862 P.2d 857, 861 & n. 5 (Alaska 1993)]; J.L.F., 828 P.2d at 169. However, plugging the definition in AS 47.10.990(1) into subsection (A) results in the following: "having no parent ... providing for the physical, emotional, mental, and social needs of the child or willing to provide for the physical, emotional, mental, and social needs of the child." The statute still would not require ability to care  willingness is enough.
912 P.2d at 1239.
Our decision in S.A. and D.A. was not based solely on the plain language of subsection (A), however. We also reviewed the structure of AS 47.10.010(a)(2) and concluded that reading an ability to care component into subsection (A) would give the State broader power to assume custody of children than intended by the legislature, and would tend to undermine the specific grounds expressed in subsections (B) through (F). We stated:

*1261 An analysis of the structure and purposes of the entirety of AS 47.10.010(a)(2) shows that while ability to care is relevant under subsections (B) through (F) of the statute, it is not relevant under subsection (A), for three main reasons. First, the State's interpretation of subsection (A) would permit CINA adjudications based on parenting deficiencies much less severe than those covered under AS 47.10.010(a)(2)(B)-(F). Second, unlike subsection (A), subsections (B) through (F) set clear, specific standards for adjudicating a child CINA based on a parent's inability to care. Third, permitting ability to care to be considered under subsection (A) would make subsections (B) through (F) virtually superfluous.
....
Under subsections (B) through (F), only serious forms of parental misconduct can support a CINA adjudication. Subsection (B) deals with failure to provide needed medical treatment. Subsection (C) concerns "substantial physical harm" caused by parental conduct. Subsection (D) addresses sexual abuse. Subsection (E) is about parental encouragement of criminal conduct. And subsection (F) speaks of "substantial physical abuse or neglect." The legislature thus intended for the State to be able to assume custody of minors only to remedy severe parenting deficiencies and prevent significant harm to children.
But the State's reading of subsection (A) would give the State the power to assume custody over children for much less serious types of parental misconduct and harm to children. The State would define ability to care as the ability to provide for the physical, emotional, mental, and social needs of a child, relying on AS 47.10.990(1). See F.T., 862 P.2d at 861 & n. 5; J.L.F., 828 P.2d at 169. This interpretation would permit the State to assume custody over any child who had needs the child's parents could not meet. Applied to the facts of this case, the State's interpretation would justify terminating N.A.'s parental rights on the grounds that S.A. and D.A. would not "meet their potential" with N.A. because she would not be able to satisfy their needs for "structure and consistency."
912 P.2d at 1240-1241. Our decision in S.A. and D.A. was made in the context of a parent who was willing to provide care. It applies as well to this case where there is a relative willing to provide care because the terms "parent" and "relative" are parallel in subsection (A).

III. The Trial Court Erred in Concluding That T.H. and L.H. Were Not Willing to Care for the Children.

In a termination proceeding the State has the burden of proving "both the CINA status of the child and the existence of grounds for termination by clear and convincing evidence." A.M. v. State, 891 P.2d 815, 820 (Alaska 1995); CINA Rule 15(c). Findings of fact of the trial court must be upheld unless they are clearly erroneous. A.M., 891 P.2d at 820; Alaska R.Civ.P. 52(a). We will determine that a trial court's findings are clearly erroneous only if upon a careful and thorough review of the record we have a definite and firm conviction that a mistake has been made. See S.A. and D.A., 912 P.2d at 1237.
K.F.'s argument concerning the error claimed in the trial court's factual finding assumes for the purposes of argument that there is an ability component encompassed within the "willing to care" standard of subsection (A). For purposes of this argument we accept this assumption. We further consider that the required ability component is such that it would be satisfied by persons of average or normal parenting ability. As Justice Eastaugh stated in his concurrence in In re S.A. and D.A.:
The ability of a parent or relative to provide care should be compared to a normal level of parental fitness. For example, if no person could successfully provide the care required to cure an incurably-ill child, general parental fitness would nonetheless *1262 be sufficient to defeat jurisdiction under AS 47.10.010(a)(2)(A). For jurisdiction to be found under subsection (A), the inability to care would have to lead to a harm or a threat of harm of a gravity comparable to that presented by the circumstances specified in other parts of AS 47.10.010(a)(2)....
According to the court, the State's reading of subsection (A) in this case would permit the State to assume custody over "any child who has needs the child's parents could not meet." Opinion at 13. As noted above, I agree that such a reading would be too broad.
912 P.2d at 1247-1248 (Eastaugh, J., concurring).
At the request of the State, the Department of Social and Health Services of the State of Washington conducted a homestudy of T.H. and L.H. in June of 1990. The study was admitted in evidence in the hearing on remand.[5] It presents T.H. and L.H. as normal well-adjusted people. The report concludes that T.H. and L.H. "would be a good resource for the boys," stating:
[T.H. and L.H.] appear to have a stable marriage and both want to have the boys. Both are easygoing people and I feel would not have unrealistically high expectations for the boys. They want the boys to be with family and they want to have a family, so are doubly motivated. [T.H. and L.H.] enjoy doing a lot of family activities and would include the boys in these activities.
The trial court rejected the homestudy, finding that T.H. and L.H. were not able to provide care for the children for two reasons: first, that T.H. and L.H. had "an unrealistic plan that the children be placed with [them] so they could ultimately be placed with their biological mother;" and second, that in 1990 "[L.H.] intentionally and repeatedly misled the Department about the location of the mother of the children when the Department was attempting to serve the mother with the original petition for termination of parental rights." According to the court, misleading the State when it was attempting to serve process on the mother "exhibited a lack of ability to cooperate with agencies involved in providing services for these children."
The first reason, the unrealistic plan, is insufficient to support a finding of inability for a number of reasons. First, L.H. did not testify that she wanted to take the children so that they "could ultimately be placed" with K.F., nor did anyone else testify that this was T.H. and L.H.'s plan. L.H. did testify that K.F. had lived with her and her husband for the past several years and that she hoped K.F. would be allowed to continue to live with them when the children were placed with them. She and her husband planned to take care of the children. However, they would observe K.F. with the children and hoped to be able to allow K.F. to participate in their care. She also testified that if the Alaska or Washington authorities thought it was important that the mother not reside with the children she would be guided by their directives. She testified that she had reared K.F. for some seven years of K.F.'s childhood, that she understood K.F.'s limitations, and that if K.F. lived with her and the children K.F. would follow her rules and instructions. She also testified that she wanted to adopt the children.
Second, while the State's witnesses testified that it would be against the best interests of the children to move them from their present long-term foster care placement, none of them testified that having K.F. reside with the children and T.H. and L.H. was in itself, apart from the harm the separation from the foster parents would cause, an unrealistic plan or one that would be detrimental to the children.[6]
Third, T.H. and L.H.'s actual plan was not unchangeable. L.H. testified that she would *1263 work with the Washington and Alaska authorities concerning the children's needs and that if the authorities required that K.F. not live with them that would be done. K.F. agreed that if necessary she would live with an uncle in South Dakota.
We turn next to the second reason for the court's finding of inability, that L.H. repeatedly misled the State social worker who was trying to locate K.F. for service of process purposes. The social worker, Huffman, testified on direct examination that he "repeatedly" let L.H. know that he was trying to contact K.F. so that the termination trial could go forward, that L.H. was not candid with him, that finally he told L.H. that he knew that K.F. was there and that L.H. then admitted this and said that she was trying to protect K.F. On cross-examination Huffman acknowledged department policy to note all conversations, and that he had notes of only two conversations with L.H., one on June 6, 1990, and one on June 20, 1990. On redirect he testified that he may have made earlier calls to L.H. ("I may have called and just given her some information.") or that he "may not have had more conversations than that during that time frame...." L.H. testified that when Huffman first asked her if K.F. was "there" she was not. Subsequently, K.F. did move in with T.H. and L.H. and L.H. so informed Huffman.
The trial court found that L.H. had "intentionally and repeatedly misled the department about the location of the mother...." As that finding is supported by the testimony of Huffman given on direct examination it is not clearly erroneous and may not be set aside. However, the information provided by this finding is too limited, taken alone, to supply a reliable basis for concluding that T.H. and L.H. lacked the capacity to cooperate with service providing agencies, or, more generally, lacked normal parenting abilities. As there is no other evidence adverse to T.H. and L.H. concerning their parenting abilities, the trial court's conclusion on this point is clearly erroneous.

IV. The Trial Court Erred in Concluding That Unreasonable Withholding of Consent to Adoption as Provided in AS 25.23.180(c)(2) Was a Ground for Termination of Parental Rights Applicable to This Case.

The trial court as an alternative ground for terminating K.F.'s parental rights found that K.F. had unreasonably withheld her consent to the adoption of the children by the foster parents with whom they had been placed for four years and eight months. The standard which permits termination of parental rights for unreasonably withholding consent to adoption is expressed in a section of the adoption statutes, AS 25.23.180(c)(2). See supra note 3. K.F. argues that in proceedings under Chapter 10 of Title 47 parental termination grounds are limited to those expressed in AS 47.10.080(c)(3).[7] She argues that termination under AS 25.23.180(c)(2) is available only when a petition for adoption has been filed[8] and that incorporating the standard of unreasonably withholding consent into the CINA statutes permits termination merely because the best interests of a child are furthered by the termination:
The state could argue that it would be "unreasonable" for a parent not to consent *1264 to an adoption which would place the child in a setting with a significantly better chance of success in life and terminate parental rights based on that proposition. Such a result would not only be absurd, but completely antithetical to the respect for parental rights recognized by this court and the child in need of aid statutes.
In response, the State argues that AS 25.23.180(c) explicitly applies to proceedings under AS 47.10 and that the filing of an adoption proceeding is not required prior to application of AS 25.23.180(c)(2) in CINA proceedings. In answer to K.F.'s argument that the unreasonable withholding standard could effect a termination of parental rights based solely on the best interests of the child, the State argues that there is an implied requirement that the parent who is unreasonably withholding consent be unfit before this standard can be employed.
While the statute clearly contemplates that the unreasonable withholding of consent standard can be used in certain CINA proceedings, it is less clear that this standard can be employed in CINA proceedings which are conducted when no adoption petition has been filed. Further, the broad unreasonable withholding of consent standard is in marked contrast to the specific standards for termination of parental rights expressed in AS 47.10.010(a)(2) and 47.10.080(c)(3). Read literally, it does permit termination of the parental rights of a parent who does not have custody on the sole ground that termination is in the best interest of the child. However, we find it unnecessary to resolve the various questions raised by the parties concerning application of the unreasonable withholding of consent standard for two reasons.
First, CINA proceedings have an adjudicative and a dispositional component. See CINA Rules Part VI, Rule 15 and Part VII, Rules 16 through 20. At the adjudication hearing the question is whether the child is a child in need of aid. CINA Rule 15. At the disposition hearing the question is remedial: "The purpose of a disposition hearing is to determine the appropriate disposition of a child who has been adjudicated a child in need of aid." CINA Rule 17. Termination of parental rights is a question generally decided at dispositional hearings. CINA Rule 17(d). Adjudication and termination proceedings can be combined, but termination is a remedy which can only be imposed in AS 47.10 proceedings following or contemporaneous with a CINA adjudication. The question to be resolved on remand from our prior decision was the validity of the CINA determination made in the June 1990 trial. One issue in the present appeal is whether a CINA determination has properly been made. In the absence of such a determination, a termination in a proceeding brought under AS 47.10 is not possible. Since, as we hold, the CINA determination was erroneous, the remedy of termination under the unreasonable withholding of consent standard cannot be upheld.
Second, AS 25.23.180(c)(2) applies solely to parents who do not have custody. In Delgado v. Fawcett, 515 P.2d 710 (Alaska 1973), we construed an earlier statute which provided that consent for adoption was not required of a divorced parent who is not awarded full or part-time custody of a child.[9] We construed "custody" for the purpose of that statute to include the right to visit the children. Id. at 712-13. In 1974, current AS 25.23.180(c)(2) was enacted. It is taken from section 19(c)(3) of the Uniform Adoption Act of 1969.[10] In Kottsick v. Carlson, 241 N.W.2d 842 (N.D. 1976), the court construed this section and concluded that a parent who has rights to visitation is not a parent who does not have "custody." In reaching this conclusion the court relied in part on Delgado, 241 N.W.2d at 847-48. We agree with this aspect of Kottsick.
*1265 At issue in this case is the trial court's determination made July 24, 1990, that the children are children in need of aid. Our first remand of this case was for the purpose of conducting further proceedings in order to determine whether the CINA adjudication of July 24, 1990, could be upheld. Prior to that adjudication there was no court order which deprived the mother of visitation rights. She was actively visiting them and cooperating with the remedial efforts made by the State until the State stopped her visits on December 11 or 12 of 1989. She was therefore not "a parent who does not have custody" within the meaning of subsection 180(c)(2). Of course, based on the CINA finding and order of termination of July 24, 1990, K.F. no longer had custody of the children. However, since it is the validity of this finding and order which is currently in question, the finding and order may not be used to support a termination based on 180(c)(2).

V. Cross-Appeal Issues

The guardian ad litem (GAL) and the State have filed cross-appeals,[11] contending that the trial court on remand erred in not finding that the children were in need of aid under AS 47.10.010(a)(2)(C) and under AS 47.10.010(a)(2)(F). We originally remanded this case to the superior court with directions to consider whether CINA jurisdiction existed under AS 47.10.010(a)(2)(C), leaving it to the court's discretion whether to take additional evidence or base its decision on the record. J.L.F., 828 P.2d at 170. The court found that the record developed at the original trial was sufficient and did not support a finding that the children would be exposed to imminent risk of substantial harm. It is this finding from which the GAL and the State cross-appeal.
Under subsection (C) a child is in need of aid "if there is an imminent and substantial risk that the child will suffer [substantial physical] harm as a result of the actions done by or conditions created by the child's parent ... or the failure of the parent ... adequately to supervise the child." While acknowledging that K.F.'s children "have not suffered physical injury," the GAL argues that expert testimony established that such injury was likely to occur if the children had been left in K.F.'s custody because of her lack of appreciation and ability to identify safety hazards.
As we noted in our original decision, there is evidence that seemingly would support such a finding under subsection (C). However, the trial court was specifically directed to evaluate this evidence on remand and concluded that the record did not support "a finding that these children would be exposed to `imminent' risk of substantial harm" pursuant to AS 47.10.010(a)(2)(C). We review this finding under the clearly erroneous standard referred to above. Having reread the transcript of the original trial it is our conclusion that the trial court's finding that the children were not exposed to an imminent risk of substantial physical harm under the mother's care was not clearly erroneous.
With respect to the GAL's argument under subsection (F), this case was not remanded for the purpose of making a determination under subsection (F), nor was the issue of the possible application of subsection (F) raised before the superior court on remand. Thus this issue is not properly before us.

VI. Conclusion

This is a case in which there are relatives willing to care for the children. Therefore CINA jurisdiction under subsection (A) does not exist. The trial court's conclusion that the relatives lack normal parenting ability is clearly erroneous. The statute under which a parent's rights can be terminated when she unreasonably withholds her consent to adoption does not apply in this case because that statute may only be applied to the remedial phase of a CINA proceeding, and because *1266 the mother in this case was not lacking in custody within the meaning of section 180(c)(2). Finally, the trial court's conclusion that the children were not in imminent danger of suffering substantial physical risk should they be in the care of the mother is not clearly erroneous.
In 1990 the State had to choose between supporting the placement of these children with willing relatives of normal parenting ability or with unrelated foster parents. The State chose the unrelated foster parents, contrary to the requirements of the law. Much time has passed. The foster parents have proven to be outstanding. They are the only parents the children know. Evidence was presented that moving the children to a new family would do permanent emotional damage. What the ultimate placement of these children will be is beyond the scope of this appeal. Specific legal arguments have been raised and after a careful review of the authorities and the record we have resolved these arguments.
REVERSED and REMANDED for further proceedings.
MOORE, C.J., not participating.
EASTAUGH, Justice, with whom COMPTON, Justice, joins, concurring in part and dissenting in part.
I agree with Parts I, IV, and V of the court's opinion, and agree that reversal and remand are the correct result. I also agree with Part III to the extent it discusses the facts and concludes that the evidence is insufficient to demonstrate that T.H. and L.H. were unable to care for the children. Thus, the court unanimously agrees that the facts do not warrant the exercise of CINA jurisdiction under AS 47.10.010(a)(2)(A).
The court's opinion, however, concludes in Part II that ability to care is irrelevant to CINA jurisdiction under AS 42.10.010(a)(2)(A), at 1260-1261 (citing In re S.A. & D.A., 912 P.2d at 1239, 1242 (Alaska, January 26, 1996)). For reasons I discussed in my separate opinion in that case, I disagree with Part II of the opinion in the case now before us. Ability to care is and must be relevant to jurisdiction under AS 47.10.010(a)(2)(A). S.A. & D.A., 912 P.2d at 1239 (Eastaugh, J., concurring in part and dissenting in part). I also disagree with Part III of the court's opinion to the extent it implies inability is irrelevant, or must be discussed only "[f]or purposes of ... argument." Op. at 1261.
NOTES
[1] The circumstances in which a child may be found a child in need of aid are defined in AS 47.10.010(a)(2):

(a) Proceedings relating to a minor under 18 years of age residing or found in the state are governed by this chapter, except as otherwise provided in this chapter, when the court finds the minor
....
(2) to be a child in need of aid as a result of
(A) the child being habitually absent from home or refusing to accept available care, or having no parent, guardian, custodian, or relative caring or willing to provide care, including physical abandonment by
(i) both parents,
(ii) the surviving parent, or
(iii) one parent if the other parent's rights and responsibilities have been terminated under AS 25.23.180(c) or AS 47.10.080 or voluntarily relinquished;
(B) the child being in need of medical treatment to cure, alleviate, or prevent substantial physical harm, or in need of treatment for mental harm as evidenced by failure to thrive, severe anxiety, depression, withdrawal, or untoward aggressive behavior or hostility toward others, and the child's parent, guardian, or custodian has knowingly failed to provide the treatment;
(C) the child having suffered substantial physical harm or if there is an imminent and substantial risk that the child will suffer such harm as a result of the actions done by or conditions created by the child's parent, guardian, or custodian or the failure of the parent, guardian, or custodian adequately to supervise the child;
(D) the child having been, or being in imminent and substantial danger of being, sexually abused either by the child's parent, guardian, or custodian, or as a result of conditions created by the child's parent, guardian, or custodian, or by the failure of the parent, guardian, or custodian adequately to supervise the child;
(E) the child committing delinquent acts as a result of pressure, guidance, or approval from the child's parents, guardian, or custodian;
(F) the child having suffered substantial physical abuse or neglect as a result of conditions created by the child's parent, guardian, or custodian.
[2] These rulings were made by the judge who presided over the original termination trial, the Honorable John Reese.
[3] In relevant part AS 25.23.180 provides:

(a) The rights of a parent with reference to a child, including parental right to control the child or to withhold consent to an adoption, may be relinquished and the relationship of parent and child terminated in or before an adoption proceeding as provided in this section.
....
(c) The relationship of parent and child may be terminated by a court order issued in connection with a proceeding under this chapter or a proceeding under AS 47.10:
(1) on the grounds specified in AS 47.10.080(c)(3);
(2) on the grounds that a parent who does not have custody is unreasonably withholding consent to adoption, contrary to the best interest of the minor child; or
(3) on grounds that the parent committed an act constituting sexual assault or sexual abuse of a minor under the laws of this state or a comparable offense under the laws of the state where the act occurred that resulted in conception of the child and that termination of the parental rights of the biological parent is in the best interests of the child.
[4] See supra p. 1259, trial court conclusion # 10.
[5] Although the State had the homestudy at the original termination trial in late June of 1990, the State did not present it to the trial court.
[6] Judge Reese at the conclusion of the original termination trial noted testimony that K.F. needed third-party help in the home and that such help was unavailable. "[S]he needs a parent aid perhaps eight hours a day. There was other testimony indicating that a third party in the home is what would really be necessary. That is not available unfortunately." As noted, the option of placement of the children with T.H. and L.H. was not explored at the first trial.
[7] AS 47.10.080(c)(3) provides:

(c) If the court finds that the minor is a child in need of aid, it shall
....
(3) by order, upon a showing in the adjudication by clear and convincing evidence that there is a child in need of aid under AS 47.10.010(a)(2) as a result of parental conduct and upon a showing in the disposition by clear and convincing evidence that the parental conduct is likely to continue to exist if there is no termination of parental rights, terminate parental rights and responsibilities of one or both parents and commit the child to the department or to a legally appointed guardian of the person of the child, and the department or guardian shall report annually to the court on efforts being made to find a permanent placement for the child.
[8] No petition for adoption has been filed concerning J.L.F. and K.W.F.
[9] The statute was former AS 20.10.040(5).
[10] Five states including Alaska adopted the 1969 revised act. See 9 U.L.A. 93 (Supp. 1995). The 1969 act has been superseded by the Uniform Adoption Act of 1994 which considerably narrows the grounds for terminating the parent-child relationship. See Unif. Adoption Act (1994) § 3-504, 9 U.L.A. 53 (Supp. 1995).
[11] Although both the State and the GAL are cross-appellants, the GAL has taken the lead in this aspect of the case; the State has incorporated the GAL's brief by reference.